NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0196n.06

Case No. 08-3731

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 26, 2010**
LEONARD GREEN, Clerk

| | |
|---|---|
| MELANIE BRINER, et al., ) | |
| ) | |
| Plaintiffs-Appellants, ) | |
| ) | |
| v. ) | ON APPEAL FROM THE |
| ) | UNITED STATES DISTRICT |
| CITY of ONTARIO, et al., ) | COURT FOR THE NORTHERN |
| ) | DISTRICT OF OHIO |
| Defendants-Appellees. ) | |
| ) | |
| ——————————————————— ) | |

BEFORE: BATCHELDER, Chief Judge; KENNEDY and McKEAGUE, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. The plaintiffs appeal the grant of summary judgment to the defendants in this action for retaliation and related claims arising from the removal of their business from a municipal towing list. For the reasons that follow, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

This case arises out of a series of disputes between Appellants Tom and Melanie Briner and certain officials of the City of Ontario, Ohio (the "City"), where the Briners reside. In early 2004, the Briners purchased a towing company, F&W Towing ("F&W"), which, among other things, towed vehicles for the City and other nearby municipalities as a participant on the towing "rotational call list" maintained by the police departments of the various municipalities.[1]

---

[1] F&W had been on the tow list for the City of Mansfield, the Ohio State Highway Patrol, the Lexington Police Department, and the Richland County Sheriff. They were eventually removed from all of these lists.

On December 20, 2004, the F&W office was burglarized and $2,000 was stolen from the cash drawer. The office was not ransacked and nothing else was taken or disturbed. The Briners reported the theft to the Ontario City Police Department (the "Department"), and stated that they believed that Billy Hamm, a former F&W employee, had committed the crime. After an initial investigation by other officers, the case was turned over to Detective Riley Snavely. Det. Snavely left the crime scene and drove to the Hamms' house. Mr. Hamm was not at home, but was waiting at the police station when Det. Snavely returned there.

Det. Snavely interviewed Mr. Hamm and his wife at the police station, but did not record the conversation in any way. Det. Snavely interviewed an F&W employee named Tim (who, according to Det. Snavely, vouched for Hamm), and attempted to contact other F&W employees, but was unable to convince any other employees to come to the police station to be interviewed. At his deposition, Det. Snavely indicated that one F&W employee, Debra Hissong, refused to come to the police station because she wished to remain with her husband, who was recovering from open-heart surgery.[2]

Det. Snavely never solved the investigation into the F&W burglary. He apparently concluded that Mr. Hamm had not done it and then closed the case, explaining that F&W employees would not come to the police station to give statements.

There is some evidence that Det. Snavely closed the case because he thought the Briners had staged the robbery themselves. Melanie Briner recounted her final discussion with Det. Snavely this way:

---

[2]There is some evidence that Det. Snavely may have had a pre-existing bias against Ms. Hissong. Ms. Hissong's son, Jason, had married Det. Snavely's ex-wife, and the two had been involved in an altercation shortly after Jason and Det. Snavely's ex-wife began dating. Jason subsequently filed a complaint against Det. Snavely with the Department. Det. Snavely had also previously arrested another of Ms. Hissong's sons for auto theft and knew that the same son had been incarcerated in a federal penitentiary for narcotics distribution.

2

> [Det. Snavely] started to say things like, well, Mrs. Briner, Billy Ham[m] told me you're in financial trouble[,] and I said, no, I would not discuss my finances with my employees, and [Det. Snavely] said ---- he looked around the building and he said, you must have a pretty big loan on this building and everything, and I said, what does that have to do with anything? [Det. Snavely] was, in my mind, the other officer was there, [but Det. Snavely] was insinuating that maybe we had robbed ourselves.

The Briners expressed some dissatisfaction with what they perceived as Det. Snavely's failure to adequately investigate the case.

Shortly after the burglary and curtailed investigation, on or about December 27, 2004, Officer Don Wallace accompanied Mr. Hamm to F&W to obtain a copy of some pay records from F&W, relevant to Mr. Hamm's former employment with F&W. Upset that the Department would send an officer to assist the person who they believed was responsible for a burglary the Department allegedly refused to solve, the Briners went to the police station on December 28, 2004, to complain.

Although they had no appointment, Ontario Police Chief Timothy McClaren agreed to speak with the Briners, but did so in the lobby of the police station, rather than in the privacy of his office. The Briners indicated that they were upset but Chief McClaran responded that Officer Wallace had merely performed a "civil standby," to keep a potentially volatile situation under control. The Briners complained that this was an insult and an improper use of tax payer funds, that Det. Snavely had been "rude and disrespectful to them," and that the burglary of their business was not receiving the attention it deserved. The Briners alleged that Chief McClaran "took a tone" with them, an attitude of impatience and intimidation, made it clear that they were annoying him, and walked away without saying goodbye. McClaran apparently wrote them a letter (not in the record), informing them that their complaint had no merit and that the investigation of their burglary was closed. The evidence before the district court indicates that this was their <u>first complaint</u> ever about the Department.

3

During the same time period (circa December 2004[3]), the Briners had agreed to trade two of their old tow trucks to an employee, Larry Paone, for a 1993 GMC pick-up truck. On December 1, 2004, the parties exchanged the trucks — the Briners gave Larry the two tow trucks, transferred their titles to Larry, and took physical possession of the GMC pick-up. This is not disputed. The Briners parked the GMC pick-up in their driveway in front of their house for the following two months. At the time of the exchange, Larry did not provide the title to the GMC pick-up truck,[4] claiming that he could not find the title but promising to provide it when found.

On December 12, 2004, the Briners allegedly learned that Larry had been misusing company assets for personal gain and fired him. On December 16, 2004, Larry came to the F&W office to discuss this termination. He was unable to convince the Briners to reconsider his termination, but Ms. Briner again reminded him that he still needed to bring the title to the GMC truck. The Briners claimed that Larry next came to the office on December 30, 2004, to deliver the title to the GMC pick-up truck, and that Larry signed the title in the F&W office and Melanie Briner notarized it on that day. Larry claimed that he had not gone to F&W that day, but had been with his father, Dave Paone, all day. The Briners eventually pursued (and won) a civil suit against Larry on a conversion claim regarding the truck. At the trial in that case, Larry testified that he couldn't recall where he was on December 30 and recanted his earlier assertions. The court made an express finding: "14. Larry delivered the title for the '93 [GMC pick-up truck] to [the Briners] on December 30, 2004. The Court finds that [Larry] did in fact sign the title in front of Melanie Briner, a notary." *F & W Towing v. Larry Paone*, Case NO. 2005-CVH-1263, *3 (Mansfield Municipal Court, Judgment dated

---

[3]The burglary occurred on December 20, 2004.

[4]During the Department's investigation of the theft, Larry initially claimed that he had left the title in the glove box, but later recanted under oath.

4

May 4, 2006).

After the exchange of possession of the vehicles, a dispute arose between Larry and the Briners over their agreement. Larry claimed that the Briners had promised to make some repairs to one of the tow trucks that Larry received. Allegedly, the Briners failed to do so, and Larry proceeded to take action. At some point on December 30, 2004, Larry and Dave Paone went to a vehicle title office, reported the title "lost or stolen," and obtained a duplicate title for the GMC truck. Dave subsequently went to the Briners' home and took the GMC pick-up truck. He explained in a sworn statement:

> On January 25, 2005, I took a truck from the residence of the Briners.
>
> On that day, I called the Ontario Police *after* I picked up the truck. I spoke to a dispatcher first and thereafter I talked to Chief McClaran.
>
> I have known Chief McClaran for many years and we have always been friendly, but we are not close friends and we do not socialize with each other.[5]
>
> This whole thing was about me trying to protect my son. I felt he was being taken advantage of. They [the Briners] had fired him just 13 days before Christmas, a man with five kids, who was experiencing drug problems, and then they did not pay him his last paycheck. They also refused to fix a clutch on a truck as they had promised my son. I took the truck in order to make these things right. *If the Briners and F & W had paid my son back what they owed him, I would have given them their truck back* at any time. I held it for well over a year.
>
> I told my son I would take care of this mess and this is what I did. I simply called the Ontario Police. I did not lie to the Ontario Police or Chief McClaran about this at all. *I did not claim that this was a court order, or that I had any lien, or that this was a lawful repossession or recovery.*

(underlining in original, italics added).

When Dave Paone called Chief McClaran, Chief McClaran assured him that the police would not interfere. Chief McClaran then told the dispatcher that, if a call came in from the Briners, the

---

[5]At one point during his deposition testimony, Chief McClaran testified that he and Dave are friends and while they don't "socialize," he sees and speaks with Dave at least once a month.

dispatcher should not treat it as a theft, but should simply process a report because it was not a theft, it was a legal repossession of a truck.[6]  When the Briners called the police to report their truck stolen, the dispatcher — having been instructed by Chief McClaran — replied that "Chief McClaran said the truck was not stolen because it is back in the hands of its rightful owner."  First Am. Compl. at ¶ 26.[7]  The Briners allege that, because Dave never told Chief McClaran that he lawfully repossessed the GMC truck, Chief McClaren was denying legitimate requests for police assistance in retaliation for the Briners' complaints against the Department.

The Briners continued to press their case.  They went to the police station to file a report concerning the theft of their truck and presented their copy of the title which had been signed by Larry Paone.  Officer Tom Hill was assigned to take the Briners' statements and begin the investigation.  Officer Hill took the Briners back to an interview room and, unbeknownst to the Briners, videotaped this conversation.  Officer Hill testified that, prior to this time, he was aware of the Briners' complaint about Officer Wallace regarding the civil stand-by, which Officer Hill characterized as a "false or unfair complaint," and that was the reason he chose to videotape the conversation.  The Briners gave their statement to Officer Hill, indicating that Larry Paone had stolen the GMC truck, and then left the police station.

Officer Hill noted two concerns about the title provided by the Briners.  First, because the

---

[6]Note that Dave Paone stated, in his sworn statement, that he did not tell Chief McClaran it was a lawful repossession.

[7]When asked about this determination of ownership on the witness stand, Chief McClaran was emphatic:

[Question].    If Dave Paone said he had the title, that was then end of it, you believed him, don't believe somebody else that comes in with a valid certification of title.  You'd already made that conclusion.

[McClaran].    Based on what Mr. Paone told me, yes.

McClaran trial testimony at Melanie Briner's criminal trial (hereinafter, "McClaran Trial Testimony") at 170.

6

Briners had not yet registered the transfer, the title was "open" and still in Larry's name. Second, there were certain hand-written alterations to the transaction page of the title.[8] Due to these concerns, Officer Hill decided that the Briners would need to prove they actually owned the truck before he could legitimately consider it a theft.

Officer Hill called Dave, who told him that he and Larry had "repossessed" the truck because the Briners breached their agreement on the trade, and told Officer Hill where to reach Larry. Officer Hill then called Larry, who told Officer Hill the same thing. Later that day, Dave came to the police station and provided the duplicate title Larry had obtained by claiming the original title had been lost or stolen. Officer Hill provided Dave with a witness statement form. Dave took that form home to Larry, who filled it out, indicating that he had not gone to F&W on December 30, 2004, but had been with Dave all day.[9] When Dave returned to the police station with Larry's completed witness statement, Officer Hill verified it as though he had taken the statement himself. Officer Hill later admitted, under oath, to falsifying this verification.

Officer Hill then requested that the Briners come to the police station to answer some questions. Officer Hill took them to the interrogation room and informed them that he would be videotaping the interview. Officer Hill repeatedly asked Ms. Briner whether anyone else at F&W had seen Larry sign the title on December 30. Ms. Briner first indicated that no one had seen Larry sign the title and later, after being pressed by Officer Hill, indicated that she did not believe anyone had. Officer Hill urged her to question F&W employees and obtain statements from anyone who

___

[8]In the space provided for the date of delivery, the number one in "12/1/04" had been over-written with the number 30, to read "12/30/04." In the notary's box, the two in "20th day of Dec." had been over-written with a three, to read "30th day of Dec." Finally, the price and odometer reading had not been filled in.

[9]The fact that Larry offered, and Officer Hill accepted, a witness statement regarding the events at F&W on December 30, 2004, rather than events surrounding the alleged theft of the truck by Larry and Dave, is some evidence that Officer Hill was not engaged in investigating the theft, but had already begun investigating Ms. Briner.

had.[10] Officer Hill also repeatedly asked Ms. Briner, in a variety of ways, whether she had changed the title, to which Ms. Briner responded that she had not. At her deposition, she explained that, even when Officer Hill specifically asked her about the specific changes Officer Hill was concerned about, she had understood him to be asking whether she had changed it *after* Larry took the truck (i.e., after January 25). Because she had changed it at the time she notarized the title (that is, she changed them both on December 30, in order to complete the form accurately, so she thought), she adhered to her statement that she had not changed the title. Officer Hill, however, thought that he had caught her in a lie, and apparently, could not contain his satisfaction. At her deposition, Melanie Briner testified about the conclusion of this interview as follows:

Question: Now, at some point in time during the deposition earlier today you said that the police never believed anything that you told them, true?

M. Briner: Yes.

Question: When did you come to that conclusion?

M. Briner: Pretty much the night of January 25th when I found out that all that happened was Larry Paone got a phone call. Dave Paone pretty much just talked to the chief and they didn't - - they [the Ontario Police] made no indication that they were going to look into the duplicate title, how it was obtained, because I said it had to have been obtained fraudulently. I had possession of the truck. Nobody [had] filed a report against me for having the truck.

Question: So on January 25th, '05, you had concluded that the City of Ontario would not believe you; is that true?

M. Briner: When [Officer] Tommy Hill was yelling at me in the hallway, better get a good lawyer, Mrs. Briner.

M. Briner Depo. at 24-25.

Shortly thereafter, Officer Hill handed the investigation over to Det. Snavely, who appears

---

[10]It is unclear how the December 30 events at F&W are relevant to a determination of whether the GMC truck had been stolen, as it is undisputed that Larry, at some point on or prior to December 30, 2004, provided the Briners with the title to the GMC truck. Much clearer is the relevance of the December 30 events at F&W to Officer Hill's apparent investigation of Ms. Briner.

to have formally abandoned any investigation of theft of the GMC truck and focused solely on the alleged false statements. On January 28, 2005, Det. Snavely took the title that Melanie had given to Officer Hill to the Richland (Ohio) County Clerk of Courts and showed it to three different employees there. Det. Snavely alleges that all three employees told him that the title was void because it had been altered and because the purchase price and mileage had not been filled in. The alleged statements by these employees, however, do not comport with the official policies and procedures of the Richland County Clerk's office. The Richland County Clerk later explained that any such statements were erroneous and should not have been made, and indicated in an official letter to the Ontario City Law Director, dated February 21, 2006, "that our normal practice is not to question notary information on titles as it is not our job to question the purchase price, notary information, or odometer statements."[11]

Det. Snavely took no further action on the case until March 10, 2005. The Briners, however, continued their attempts to move the investigation along. In response to Officer Hill's request that they question F&W employees regarding the December 30 events, the Briners provided the Department with the statements of three F&W employees (Bob Myers, Bob Buckholdt, and Debra Hissong) who indicated that Larry had been at F&W on December 30 to provide the title. Ms. Briner typed the statements, each employee signed his or her statement, and the statements were notarized. Mr. Briner took the statements to the police department on February 16 or 17 but the Department took no further action at that time.

The Briners aired their complaints regarding the investigations, or apparent lack thereof, to

_____

[11]While the County Clerk's letter does appear to confirm that Det. Snavely did converse with certain County Clerk employees, it indicates that the conversation occurred during "the summer of 2005," while Det. Snavely alleges that the conversation took place in January 2005. Moreover, the letter states only that the employees informed Det. Snavely that they would have "questioned" the information, not that the title would have been void, as alleged by Det. Snavely.

9

the Mayor. It is unclear whether the Briners leveled any complaints during their January 25th interviews, so their protest to the mayor appears to be their second complaint about the police. No action was taken after their complaints to the Mayor, so on March 10, 2005, Mr. Briner called Service-Safety Director Jim Hellinger, who had supervisory authority over the Department. Chief McClaren was in Director Hellinger's office at the time, so Director Hellinger put the call on speaker phone. Director Hellinger and Chief McClaren then listened as Mr. Briner inquired about the investigation and complained about the lack of progress and the police in general (including Chief McClaran). This telephone call constitutes at least the Briners' third public complaint about the police. Director Hellinger then asked Chief McClaran to respond, and Chief McClaran said he would look into it.

After taking a look at the witness statements that the Briners had provided, either Chief McClaran or Det. Snavely told Officer Hill to bring Debra Hissong, one of the F&W employees who had provided a statement, into the station and question her about her statement.[12] When Ms. Hissong was brought to the police station, Officer Hill conducted the questioning.[13]

There is some evidence to indicate that Chief McClaran did not intend the Department to pursue an investigation into the theft of the GMC truck, but rather to pursue their previous investigation of Ms. Briner for false statements, to which they now added an inquiry into Ms. Hissong. At Ms. Briner's criminal trial, Chief McClaran offered the following testimony:

> Q.    You were convinced that Melanie Briner had not witnessed Larry Paone sign the title in front of her at F&W on December 30th, 2004, before you brought Deb Hissong in on March 10th.

---

[12]It appears that the other two statements by F&W employees were ignored.

[13]As previously noted, Det. Snavely, who appears to have been assigned to the case, had a prior history with the Hissong family. *Supra* at __.

10

[McClaran]. Correct

McClaran Trial Testimony at 201. The tone and content of the Department's questioning of Ms. Hissong offers further evidentiary support for the Briners' contention that Chief McClaren responded to complaints about his performance, and the performance of the Department, by the Briners by furthering an investigation into their alleged crimes, rather than the alleged crimes against them.

Ms. Hissong had asserted in her sworn statement that she had been in the F&W office on December 30, 2004, and had observed Larry sign the title to the GMC truck in Ms. Briner's office. Officer Hill thought this was a false statement. In questioning Ms. Hissong, Officer Hill insisted that he knew that Larry had not been at F&W on December 30. Officer Hill also showed Hissong the video in which Melanie Briner had said that no one had seen Larry sign the title in her office. Finally, Officer Hill, Chief McClaran, and perhaps others threatened Ms. Hissong that she would be charged with a felony for filing this false statement and the only way she could avoid prosecution was to recant her statement and accuse Melanie of wrongdoing. The theory of the Department and its personnel appears to be that, because Ms. Briner had typed the statement, she had fabricated the story and solicited Ms. Hissong to sign it.

Eventually, Ms. Hissong did recant her statement and indicated that Ms. Briner had asked her to sign the allegedly false statement. Shortly after leaving the police station, she called the Briners and asked to meet so that she could apologize, explain what had happened, and warn them regarding what she believed to be the Department's intentions regarding Ms. Briner. In her deposition testimony, Ms. Briner recounted the meeting:

> [Debra Hissong] was visibly upset and crying, stated that [Officer Hill, Chief McClaran, and perhaps other members of the Ontario police] pretty much told her they were, in her words, she said they were giving Larry Paone an alibi and said they knew where he was on the 30th, so she said, I thought maybe I had the date wrong,

11

and she said they kept telling her if she didn't - - in her mind, if she didn't change her statement, they would charge her with falsification. They were opening up books and showing her things, telling her stuff, and she was - - she was very upset, I think.

. . .

She stated that they took her back into the chief's office and spoke with her there, and that they did show her some of the video that had been taken of me, and just very intimidating, talking to her, just kept saying over and over, we believe the statement is false, you know. If you stand by this statement, you are going to be charged with falsification. She said the chief kept patting her on the knee in the office saying, Debbie, the truth will set you free and she was just very, very upset.

M. Briner Depo. at 68-69. This issue came up at Ms. Briner's criminal trial[14] as well, and Chief McClaran testified:

> Q. And that's why the end of the videotape of [Debra Hissong's] statement shows you standing there with the Ontario ordinances in your hand saying, You've got a heck of a break here, you could be - - you could have been charged with falsification, felony falsification.
>
> [McClaran]. I believe it was a misdemeanor, not a felony.
>
> Q. I know it's a misdemeanor, but you said on the tape it was a felony.
>
> [McClaran]. That could be. I don't know.

McClaran Trial Testimony at 205. At his deposition in the case before the district court, Chief McClaran testified as follows:

> Q. Right. But it was only after you mentioned the possibility of Ms. Hissong being prosecuted that she changed her statement and agreed to make a new one, right?
>
> [McClaran]. Yes.

McClaran Depo. at 94.

Ms. Hissong testified at Ms. Briner's criminal trial and insisted, under oath and subject to cross-examination, that her original statement (that she had seen Larry sign on December 30) had

---

[14]While Ms. Briner was not immediately charged with a crime, criminal charges were eventually brought against her and, as described below, later dismissed with prejudice.

been the truth and that she changed her story on March 10 due to confusion and intimidation by the Ontario police. Prior to Ms. Briner's criminal trial, Ms. Hissong had also met with former Assistant Law Director Catherine Beilstein and had recanted her statement to the police and reaffirmed her original sworn statement.

On March 11, 2005, the same day that Ms. Hissong was questioned and only one day after Mr. Briner had called Director Hellinger to complain about Chief McClaran and the Department, Chief McClaran sent a letter to the Briners, which stated:

> March 11, 2005
>
> Mr. Tom Briner
> F & W Towing
> 1616 W. Fourth St.
> Mansfield, Ohio 44906
>
> Ref.: Towing for Ontario Police Department
>
> Dear Sir,
>
> As you are well aware of, the Ontario Police Department is currently investigating the circumstances surrounding the case of a Breaking and Entering of your business on December 20, 2004. Officer Snavely has advised me that he has contacted or left numerous messages for your employees to contact him and as of this date only one has done so.[15] At this point that case is not progressing forward until those individuals contact Officer Snavely for statements.
>
> As to the investigation of the truck that you contend was stolen from you by Larry Paone Sr, this case is moving forward. In this case it appears that there is some questionable conduct on the part of F&W Towing and until such time [as] these issues are resolved I am removing you from the towing call out list.
>
> Should you have any questions feel free to call me.
>
> Chief T.D. McClaran

---

[15]Det. Snavely testified at his deposition that he had spoken with other F&W employees by telephone, that they had agreed to give statements, but that they were unwilling to come to the police station to do so. He stated that he would not go to meet them because he only does interviews at the station. This appears to be contradicted by the fact that he went to Mr. Hamm's home at the outset of the original burglary investigation. It also does not appear that it is official Department policy to only conduct interviews at the station, as Officer Hill repeatedly spoke with the Paones by telephone in conducting his investigation into the alleged robbery of the GMC truck and Ms. Briner's alleged false statements.

The purpose of this letter — as evidenced by the "Ref." line and Chief McClaran's deposition — was to inform the Briners that they had been removed from the towing call list. At several points in his deposition, Chief McClaran indicated that at least one of his reasons for his removing the Briners from the towing list was his irritation with their complaints about and criticism of the police department, but elsewhere in his deposition he stated that he did not remove them from the towing list for that reason.

Within a short period of time, F&W received similar notifications from other area municipalities, with the result that F&W was removed from every towing call list in the area, and without that work (and with the cost of defending Ms. Briner against criminal charges), F&W went out of business. The Briners allege that this occurred because Chief McClaran "began communicating false and defamatory statements about the Briners to others in the area business and law enforcement circles." At his deposition, Chief McClaran denied that he had spread such rumors, but said that he had heard complaints about slow response times and missing vehicles.[16] The Briners dispute this, however, and there is no documentary evidence supporting a claim of slow response times and neither F&W or anyone working there was ever charged with theft of any allegedly missing vehicles.

Although Chief McClaran had indicated that F&W would be removed from the towing call list until the questions surrounding "questionable conduct" by F&W were cleared up, it does not appear that any effort at clearing up those questions was made, as it appears that the Department ceased all inquiry into any of the alleged crimes against the Briners, or into those allegedly committed by them, following Chief McClaran's March 11 letter. Det. Snavely did not pursue any

[16]Chief McClaran testified that a Mansfield police officer had told him that F&W had towed 30 vehicles for them, but when they went to inventory the vehicles, they could only locate five.

14

further investigation into the burglary, he did not consult the prosecutor, and he did not charge Mr. Hamm or anyone else with the crime. Neither Det. Snavely nor Officer Hill pursued any investigation of the truck theft, neither consulted the prosecutor, and neither charged Larry or David Paone with the theft of the truck. Finally, neither Chief McClaran nor Officer Hill pursued any further investigation of the alleged false statements by Ms. Briner; they did not interview her or any other witnesses, they did not consult the prosecutor, and they did not charge her with any crime. As described below, however, the investigation into Ms. Briner's alleged wrongdoing was eventually revived, allegedly as a result of further complaints by the Briners against the defendants.

On April 1, 2005, the Briners sued Larry and Dave Paone in Mansfield Municipal Court and, following a bench trial, eventually recovered $5,475.85 for the unlawful conversion of the pick-up and another theft by Larry. The court made, among others, the following specific findings of fact:

14.     Larry delivered the title for the '93 [GMC pick-up truck] to [the Briners] on December 30, 2004. The Court finds that he did in fact sign the title in front of Melanie Briner, a notary.

17.     The Court further finds that based upon an applicable law governing legal repossession of an auto, neither Larry [n]or his father had the legal right to retake possession of the '93 truck using self help.

28.     Based upon the relevant evidence before the Court and the credibility of the witnesses, the Court finds that the Defendant Larry Paone breached the oral contract between he and the [Briners]. Larry did not have the right to attempt to rescind the contract in part as there had been full performance by the [Briners]. The [Paone]s have not met their burden of proof showing that the [Briners] breached the oral contract in any way.

Mansfield Municipal Court Judgment, May 4, 2006.

In June 2005, the Briners undertook an effort to get a proposal on the November ballot for a "Citizen's Police Review Board." The Briners began circulating petitions (dated June 30, 2005) and Mr. Briner placed a sign in his front yard, stating "Vote for the Police Review Board, we need

15

honest police." This act constitutes the Briners' fourth public complaint about the Department. Mr. Briner also posted a "For Sale" sign on the F&W property.

Before posting the signs, Tom Briner consulted the zoning inspector, Dallas Strickler, and Mr. Strickler told him that they were permissible political and real estate signs. A short time later — in late July or early August — Mr. Briner modified the political sign by adding content to the other side, something to the effect of "Ask the Chief about his past." Mr. Briner did not consult Mr. Strickler about this modification.[17]

Chief McClaran perceived this as a personal attack and called the City's Law Director, Rebecca Thomas,[18] and Mr. Strickler to make a complaint and to inquire about the legality of the sign. Mr. Strickler apparently agreed with Chief McClaran that the modified portion of the sign was not political but was a personal comment about a particular member of the police force (i.e., McClaran). Mr. Strickler telephoned Mr. Briner and told him to take it down, but Mr. Briner refused. Mr. Briner insisted that, because Chief McClaran was a public figure, he had a right to criticize him. Mr. Briner further modified the sign and, following additional complaints, still refused to remove it.

The Briners received a number of phone calls and letters from Mr. Strickler, threatening to refer the matter to Ms. Thomas. Mr. Briner responded that he was acting on the advice of the American Civil Liberties Union ("ACLU"), who had advised him that he was within his rights to

---

[17]It is undisputed that, from that point on, Mr. Briner changed the signs often, too often for anyone to recollect with any specificity what they said when. It is conceded that they were consistently critical of the City, the Department, and often Chief McClaran, specifically.

[18]In addition to being the Law Director, Rebecca Thomas also had a private practice. One of her private clients was Larry Paone, whom she had represented in a child-support proceeding. The Briners allege that Ms. Thomas, perhaps in concert with Chief McClaran, spread a rumor that the reason Larry Paone had been prosecuted for child support was that, while Larry worked at F&W, the Briners had withheld child-support from his paycheck but had kept it for themselves rather than giving it to Larry's wife and children.

16

post the signs. Mr. Strickler ceased his attempts to compel Mr. Briner to take down his signs only after Mr. Briner provided Mr. Strickler with a copy of the ACLU advisory letter. Other members of the Department also made their displeasure at the Briners' signs known. Mr. Briner, in his deposition testimony, stated:

> I had cruisers, Ontario Police cruisers parked across the street for long periods of time. I had them pulling in beside us on the left side of the property setting [sic] for periods of time. I noticed the same cruisers going up and down looking at the signs, just a little bit of, form of intimidation, I think.

T. Briner Depo. at 62-63. While the actions by Mr. Strickler and the Department were insufficient to convince the Briners' to remove their signs, Mr. Briner stated that they "made my wife nervous and things of that nature."

In late August 2005, it was announced that the Citizen's Police Review Board petition had gathered enough signatures to be put on the November 2005 ballot. Upon learning that the issue would be placed on the ballot, Chief McClaran went to clerk's office to investigate:

Question: After you learned [that this issue would be placed on the ballot], did you go over to the office of the clerk where those petitions were and demand to see them and take down the names of all the people who had signed those petitions?

McClaran: I got copies of the petitions.

Question: You did that the first day that you learned they were in there, didn't you?

McClaran: I don't recall what day it was.

Question: And whose office did you have to go to to get those names?

McClaran: Clerk treasurer.

. . .

Question: And what did you say to [to the clerk] when you went in there?

17

| | |
|---|---|
| McClaran: | Asked her for copies of them. |
| Question: | Did she provide them to you? |
| McClaran: | Yes. |
| Question: | Was this during the daytime when their office was open? |
| McClaran: | Yes. |
| Question: | And you were on work yourself? You were working? |
| McClaran: | Yes. |
| Question: | And this was official police business? |
| | . . . |
| McClaran: | No, it wasn't official police business. |
| Question: | Well, what was it? |
| McClaran: | I guess it would be personal business. |
| Question: | What was your purpose in going over there? |
| McClaran: | To get copies of the petitions. |
| Question: | I understand. But why did you want to know the names of the persons who appeared on those petitions? |
| | . . . |
| McClaran: | I just wanted to see what signatures were on there and if they were valid. |
| Question: | Did you take those names back to your office at the police department? |
| McClaran: | I took them home. |
| Question: | Did you do anything with that information that you can remember here today? |
| McClaran: | No. |

McClaran Depo. at 38-41. It is unclear from the record whether any private citizen could have arrived at the clerk's office and immediately obtained copies of the petitions, or whether McClaren's position as the Chief of Police allowed him access to these documents for his personal use.

18

At this point, Chief McClaran apparently began to request that the prosecutor file felony charges against Ms. Briner, based on her statements concerning Larry Paone and the alterations to the dates on the pick-up truck title. The Richland County prosecuting attorney, Brent Robinson, sent the following letter to Chief McClaran:

August 18, 2005

Chief Timothy McClaran
Ontario Police Department
555 Stumbo Road
Ontario, Ohio 44906

Re:    *Request for charges on Melanie Briner*
       *G.O. # 200500814*

Dear Chief McClaran:

Per your request through Off. Riley Snavely, I have taken a second look at felony charges in the Melanie Briner matter. Once again, I have concluded that her conduct does not rise to the level of a felony offense. However, I do believe she has committed some misdemeanor offenses. I would suggest you present the matter to the Ontario Law Director for possible misdemeanor charges.

If you would like to discuss this matter further, please do not hesitate to call me at [].

Sincerely,

Brent N. Robinson
Chief Criminal Assistant
Prosecuting Attorney.

Mr. Robinson indicates that this was Chief McClaran's second request for felony charges, indicating that the Chief had previously inquired as to the possibility of bringing charges. When asked at his deposition when he had previously requested felony charges against Ms. Briner, Chief McClaran testified that he didn't know when it was submitted the first time, that Officer Hill had done it. Officer Hill, however, testified that he did no such thing.[19] In his deposition testimony, Officer Hill

---

[19]In his affidavit, prepared and submitted later, Officer Hill averred that Det. Snavely had done it, but Officer Hill did not specify when.

19

testified as follows:

Question:      After the interview [or] meeting that you and Chief McClaran had with Debbie Hissong that day, what was the next thing you did in regard to this matter?

Off. Hill:      Nothing until late August, I think, of 2005.

Question:      So you're involved on January 25th and 26th, then you don't hear much about it until March 9th and 10th [i.e., Hissong interrogation], and you have this work you've just described for us. Then you don't hear about it again until roughly August; is that fair?

Off. Hill:      Yes.

Question:      What was the next contact that you had with this dispute after Ms. Hissong?

Off. Hill:      Chief McClaran contacted me when I arrived at work one day and told me that he had spoken to the law director and that she had reviewed the case and that I was to charge [Ms. Briner] with falsification, tampering with records, and complicity to falsification.

Question:      This was some date in August, but you couldn't tell us exactly when; is that fair?

Off. Hill:      The 22nd or 23rd, I believe.

Question:      Very good.

Off. Hill:      Late August.

Question:      As best you can remember, was this the very next time the chief had talked to you about this Briner dispute with the Paones after you'd had your meetings with Debra Hissong?

Off. Hill:      Yes.

Question:      And you don't recall any other discussions in between there until August 22nd or 23rd between you and the chief?

Off. Hill:      No.

Hill Depo. at 17.

Det. Snavely testified that, according to normal protocols, he would have been the one to submit charges to the prosecutor, and there is some evidence to indicate that Det. Snavely was the individual who did so, but he did not offer any dates as to when this was done. It is unclear why Det. Snavely would file the request for felony charges when he did not conduct the interview, prepare the case, or testify. In the end, it was Officer Hill who filed the request for misdemeanor charges.

On or about August 22 or 23, 2005, the city law director filed three misdemeanor charges against Melanie Briner: (1) tampering with records, (2) falsification, and (3) complicity to commit falsification. Officer Hill testified that these charges were filed with the explicit knowledge and approval of Chief McClaran:

Off. Hill: I'm not the one that decided we were going to charge anybody with anything. I was ordered to do so by [Chief] McClaran.

Question: Maybe I'm making an assumption here. You did not make a probable cause determination on these charges independently, did you?

Off. Hill: No.

Hill Depo. at 21. Ms. Briner entered a "not guilty" plea and prepared for trial.

In November 2005, while Ms. Briner was awaiting trial, the Citizen's Police Review Board initiative came up for a vote and the citizens of Ontario voted it down. But, the petition did prompt an external audit of the police department and a report dated November 2005, which included some interesting findings. For example:

"It is also recommended that the City examine why employees are not more willing to take their concerns to the chief. The chief's attitude and management style seem to be a consistent complaint." Employee Relations Audit Report at 8.

"[A]lmost every employee of the department commented that discipline is not handled fairly or consistently among employees. The perception is [that] whether you are disciplined [or not] depends on who you are, your relationship to the command staff, and the mood of the chief on that particular day. Both consultants

21

found the employees to be satisfied with the discipline of the command staff, but the majority [of employees] feel the chief is out of control." *Id.* at 11.

"Many of the employees felt that the chief does everything possible to make their jobs miserable and to keep the Mayor and [S]ervice-[S]afety [D]irector in the dark . . . . When asked to provide suggestions on how communication might be improved, the majority of the employees conveyed that the only way communications can be improved within the department is by eliminating the intimidating atmosphere created by the chief." *Id.* at 13.

"The majority of responses (everybody but one) recommended removing the chief from employment." *Id.* at 14.

It is noteworthy that Chief McClaran himself participated in the survey. It was reported that Chief McClaran was terminated as a result of this report, but the record reveals that he was still the chief as of March 2006 when he testified at Melanie Briner's trial.[20]

Sometime prior to Ms. Briner's trial, the prosecutor moved to dismiss the charges of "tampering with records" and "falsification" and the Municipal Court granted the motion. The trial proceeded, therefore, on only one charge: "complicity to commit falsification," based on the claim that she had solicited Ms. Hissong to make a false statement. The prosecution produced three witnesses: Chief McClaran, Officer Hill, and Ms. Hissong. While under oath, Ms. Hissong recanted her "confession," insisted that her original statement had been true, and testified that Melanie had not solicited any false statement. At the conclusion of the prosecution's case, the defense moved for acquittal or, in the alternative, dismissal on the basis that the criminal complaint did not specify the

---

[20]In fact, the record reveals that Chief McClaran was still the chief as of June 28, 2006, when he sent the following email to Mr. Strickler and Ms. Thomas:

"I arrived at work this am and was advised that Briner had a newly worded sign and was provided with a picture. The wording is 'TO THE CITY OF ONTARIO I AM WILLING TO DIE FOR MY FREEDOM OF SPEECH ARE YOU WILLING TO DIE TO TAKE IT AWAY'. I have been advised by employees that they are concerned for them and their families if they should have any contact with Briners. I also have concerns for the safety of my family. I believe this is a direct threat for anyone who works for the city. Please address this situation as soon as possible."

According to the City of Ontario's website, McClaran is no longer the chief of police.

22

elements of the offense or the conduct she had allegedly committed that would satisfy those elements. The court agreed and dismissed the charge on May 5, 2006.

Sometime in early 2006, the Briners had begun to complain about the police department at the City Council meetings. These complaints constitute at least their fifth public complaint about Chief McClaran, the Department, and the City. At a City Council meeting on March 2, 2006, Mr. Briner made a statement critical of Chief McClaran, Ms. Thomas, Officer Hill, and several other City officials and police officers.

At a City Council meeting on May 18, 2006 — the first City Council meeting after the court had dismissed the charges against Ms. Briner on May 5, 2006 — Ms. Briner addressed the City Council. She was very critical of the police department and various other city officials and complained about the fact that charges had been brought against her. The Council president explained that these were not matters the Council would address.

The Briners filed the present lawsuit on January 17, 2007, pursuant to 42 U.S.C. § 1983 and various state-law causes of action. They named the City, Chief McClaran, Det. Snavely, Officer Hill, and Zoning Inspector Strickler.[21] Their federal claims included: First Amendment retaliation; malicious prosecution; takings and denial of due process; conspiracy; municipal liability; defamation; First Amendment abridgment of free speech; and denial of equal protection (with respect to their yard signs). Their state claims included: malicious prosecution; intentional infliction of emotional distress; civil conspiracy; defamation, invasion of privacy; tortious interference with contracts; and tortious interference with business interests.[22]

---

[21]The Briners also named Ontario Police Sargent Richard Bevier and Safety-Service Director Charles Au, but subsequently dismissed these two defendants.

[22]The Briners subsequently withdrew the intentional infliction of emotional distress claim, conceded that the City was immune under state law, and conceded that the state defamation claim was time barred.

23

Mr. Briner attempted to address the Council at the February 1, 2007, meeting, but was told by the Council president that he could not speak about the pending litigation. When Mr. Briner continued to do so, the president found him out of order and had him removed from the room by a police officer. At the next available opportunity, the February 15, 2007, meeting, both Mr. and Ms. Briner addressed the Council with respect to the same complaints.

In their federal complaint, the Briners allege that, due to their complaints about the police department and their attempts to speak out about their complaints in public, the defendants entered into a sustained pattern of retaliation that resulted in false charges being filed against Ms. Briner, the destruction of their towing business (which they were forced to close on April 21, 2006), and significant business and personal losses, including medical damages, public humiliation, and legal fees.

Both sides moved for summary judgment and in so doing, submitted numerous competing motions. Ultimately, the district court denied the Briners' motions and granted summary judgment to all defendants on all claims, albeit in two separate orders.

In the first order, the district court granted summary judgment to defendants on nearly all counts. After a 10-page recitation of facts and stating the standard for summary judgment, the opinion begins with a lengthy criticism of the Briners' complaint and concludes with the following: "In view of Plaintiffs' failure to plead Claim 6 [federal defamation] with any specificity despite having filed an amended complaint, the Court hereby DISMISSES Claim 6."[23] Mem. Op., April 16, 2008, at 16.

---

[23]Notably, defendants never filed a motion for a more definitive statement, pursuant to Fed. R. Civ. P. 12(e), the appropriate means by which to obtain more specificity with regard to plaintiffs' claims. It therefore appears that the district court dismissed Claim 6 *sua sponte*.

The court then conducted a claim-by-claim analysis, beginning with the claim of First Amendment retaliation. The Briners had identified five separate incidents of retaliation, and the court rejected all but the first. As to the first (the claim that Chief McClaran had removed them from the towing list in retaliation for their complaining about the police department), the court relied on Chief McClaran's conflicting statements on this question during his previous trial testimony and during deposition — at one point Chief McClaran stated that he *had* removed F&W from the towing list because of the Briners' criticism and elsewhere he stated that he *had not*. Based on this conflicting testimony, the court denied summary judgment on this issue. The court rejected the claims based on the four other alleged incidents, further addressing at least two of them elsewhere in the opinion.

Next, the court granted summary judgment to the defendants on the Briners' claim of malicious prosecution. The court explained that probable cause to bring the charges defeats any claim of malicious prosecution, and found that "there is plenty of undisputed evidence in the record to establish probable cause" for bringing the charges against Ms. Briner. *Id.* at 23.

The district court granted summary judgment to the defendants on the takings claim by finding that the Briners had no entitlement to being on the towing list. The district court granted the defendants summary judgment on the conspiracy claim by finding that Chief McClaran was solely responsible for any harm, and could not have conspired with himself.

Relying on its earlier denial of summary judgment on the single First Amendment retaliation claim, the court denied summary judgment on the municipal liability claim. The court found that if Chief McClaran was liable, then the City was liable as well.

The district court granted summary judgment to the defendants on the Briners' claim that they were denied the right to speak at public meetings, finding that Mr. Briner was not denied the

25

right to speak because he was not "prevented from making *appropriate* public comments." *Id.* at 29 (emphasis in original). The court granted summary judgment to the defendants on the equal protection claim by finding that the Briners were never forced to take down their signs.

Finally, the district court declined jurisdiction over the state law claims, citing 28 U.S.C. § 1367(c)(3), which states: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if. . . the district court has dismissed *all* claims over which it has original jurisdiction" (emphasis added). Because the district court had denied the grant of summary judgment on one claim of First Amendment retaliation and the municipal liability claim, there yet remained claims over which the district court retained original jurisdiction.

Chief McClaran and the City moved the court to reconsider its decision, arguing that the court had misunderstood the chronology of events. Chief McClaran and the City argued that McClaran had removed the Briners from the towing list in March 2005, but that the Briners had not posted the first of the critical yard signs until June 2005. Therefore, according to Chief McClaran and the City, the Briner's criticisms could not have motivated McClaran's decision to remove them from the towing list because the public criticisms did not occur until after the removal. The district court agreed, granted reconsideration, and granted summary judgment to Chief McClaran and the City, thus finalizing the case.

The district court, in its opinion, disregarded the Briners' claims of retaliation, asserting that "¶62 of the First Amended Complaint . . . simply makes no reference to any of these instances as the basis for the [F]irst [A]mendment retaliation claim." Mem. Op., May 2, 2008, at 6. The district court also stated that the Briners allege that they were removed from the City's towing list "because they posted yard signs critical of [Chief] McClaran." *Id.* at 7. The text of paragraph 62 says:

FIRST CLAIM - RETALIATORY CONDUCT

26

62. The said acts by the Defendants, including the dropping of Plaintiffs' business from the towing list, and the vindictive prosecution of Melanie Briner, constituted unlawful retaliation, motivated at least in part by an intention to discourage and punish the Plaintiffs for exercising their constitutional rights, including the right to criticize the police. Such retaliation violates the First Amendment to the United States Constitution, and 42 U.S.C. §1983.

First Am. Compl. at ¶ 62. As discussed above, there were a number of distinct occasions where the Briners could be seen as criticizing the police, including: the Briners' complaints to Chief McClaran about the Hamm investigation (¶ 15), the Briners' complaints to the City (e.g., the Mayor) about the police (¶ 34); and Mr. Briner's complaint to Director Jim Hellinger about the Paone investigation (¶ 34). Moreover, the Briners alleged multiple acts of retaliation by Chief McClaran and other defendants, not simply being taken off the City's towing list.

The district court also suggested that the Briners's complaints about the police might not even constitute the type of speech that is protected by the First Amendment. Mem. Op., May 2, 2008, at 8 n.5 (citing *Helms v. Zubaty*, 495 F.3d 252, 256-57 (6th Cir. 2007), for the proposition that "every verbal complaint made to a government official does not rise to the level of protected speech"). The court did not cite *Houston v. Hill*, 482 U.S. 451, 461 (1987) ("contrary to the city's contention, the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"), even though the Briners cited it several times in their briefs on summary judgment.

The Briners appealed almost the entirety of the district court's ruling, raising 13 errors for review. We have consolidated these claims where possible (e.g., claims that the district court erred by denying the Briners' motion for summary judgment and by granting the defendants' motion for summary judgment as to the same claim are combined this into a single claim of error).

**ANALYSIS**

27

This court conducts a *de novo* review of the grant of summary judgment. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The Briners sued the defendants in both their individual and their official capacities. "In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). But, it also bears mention that Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978). A plaintiff may hold a local government entity liable under § 1983 only for the entity's own wrongdoing. *Id*. A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id*. This is a distinction the district court may need to address on remand, with regard to the remaining defendants and the particular claims.

After careful review of the record, we conclude that this case must be remanded to the district court. As illustrated by the "brief" summary of facts set forth above, the factual record in this case is not insubstantial. That factual record, upon a motion for summary judgment, must be construed in the light most favorable to the non-moving party, a sometimes difficult task when both sides have moved the court for summary judgment. The summary of facts utilized by the district court in its

28

opinion, taken in isolation, might be seen as sufficient to award summary judgment, but placed in the context of the larger record amassed in this case, we cannot conclude that the district court appropriately considered all facts in the light most favorable to the non-moving party. While not a comprehensive list of all factual disputes that preclude summary judgment, we offer the following analysis as an aid to the district court in proceeding to trial.

### 1. First Amendment Retaliation Claim

The Briners stated five separate examples or instances of retaliation in their brief in opposition to Chief McClaran's motion for summary judgment on this particular claim: first, the Briners allege that Chief McClaran and the Department refused to investigate the theft of the GMC truck in retaliation for complaints regarding the Department's alleged failure to properly investigate the F&W burglary; second, the Briners allege that Chief McClaran removed F&W from the City tow-list in retaliation for Mr. Briner's complaints to Director Hellinger; third, the Briners allege that Chief McClaran and the Department brought criminal charges against Ms. Briner in retaliation for their Police Review Board proposal; fourth, the Briners allege that they were subject to legal threats and harassment in retaliation for their lawn signs; and fifth, the Briners allege that they were prohibited from speaking during City Council meetings in retaliation for filing the present lawsuit.

"To prevail on [a] retaliation claim, [p]laintiffs must establish (i) that they were engaged in constitutionally protected conduct; (ii) that Defendants' adverse action caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct; and (iii) that the adverse action was motivated <u>at least in part</u> as a response to the exercise of their constitutional rights." *Lucas v. Monroe County*, 203 F.3d 964, 973 (6th Cir. 2000).

The Briners claim that their conduct in all five examples (criticism of the police) is constitutionally protected speech. See *Houston*, 482 U.S. at 461 ("contrary to the city's contention,

29

the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"). The district court appears to have failed to consider the import of the Supreme Court's holding in *Houston* in reaching its conclusion, but there is sufficient evidence to permit the conclusion that the Briners' criticisms of the police were protected under *Houston*. Upon remand, therefore, the district court must reconsider whether the Briners' conduct meets the requirements for protected speech.

With regard to the second and third elements of the Briners' retaliation claims, there is sufficient evidence, when viewed in the light most favorable to the Briners, to preclude summary judgment. For each of the Briners' five claims, there is sufficient evidence to support a finding of injury which would likely chill further criticism of public officials. There is also sufficient evidence to support a finding that Appellee's actions were motivated, at least in part, in retaliation for the Briners' criticisms. As but one example, when the Briners reported the theft of their GMC truck, they were informed that it wasn't a theft, but that the rightful owner had taken back possession. This was done at the command of Chief McClaran, who admitted he was annoyed by the Briners' criticisms, even though the Paones admitted that they were taking back a truck based on a contract dispute, and not based on who had a valid legal claim to possession. Officer Hill also testified that, when the Briners arrived to give their statement, he videotaped their statement without their knowledge, and that he knew about the Briners' previous complaints about fellow officers, calling the complaints false or unfair. His actions in conducting the investigation could also be interpreted as investigating the Briners, rather than the Paones, who admitted to taking the truck in question.

This evidence indicates a genuine issue of material fact regarding the Briners' first claim for First Amendment retaliation. The Briners' second through fourth claims are similarly supported by sufficient evidence to create a genuine issue of material fact, as a reasonable jury could conclude that

the continued complaints by the Briners led to retaliatory removal from the City tow-list,[24] prosecution of Ms. Briner for her allegedly false statements, and alleged threats and harassment regarding the Briners' lawn signs. With regard to the fourth claim, the district court held that there was no injury because the Briners were never required to remove their signs. That determination, however, fails to take into account the evidence presented that the Briners suffered some amount of fear, intimidation, and anxiety as a result of the alleged legal threats and harassment. *See Bloch*, 156 F.3d at 679 ("the Supreme Court has held that, in the context of a § 1983 action, 'compensatory damages may include . . . such injuries as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'") (quoting *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). The existence of genuine issues of material fact on these claims precludes summary judgment for either party on the Briners' first through fourth First Amendment retaliation claims. The district court's grant of summary judgment is reversed. Because this is a jury question, the district court's denial of summary judgment to the Briners is affirmed.

On the fifth retaliation claim, the Briners produced sufficient evidence to defeat summary judgment on the question of whether Mr. Briner's speech at the City Council meeting was protected, but there is insufficient evidence to create a genuine issue of material fact on whether the City's actions constitute retaliation. We will therefore affirm summary judgment for Appellees on the fifth retaliation claim.

### 2. Malicious Prosecution

"[T]his [c]ourt has yet to resolve the elements of a federal malicious prosecution claim, [but]

---

[24]We note that Chief McClaran appears to have admitted, under oath, that he removed the F&W from the tow-list in retaliation for their complaints to Director Hellinger.

it is clear that a plaintiff must show, at a minimum, that there was no probable cause to justify his arrest and prosecution." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citations, quotation marks, and editorial marks omitted). The Ohio law on malicious prosecution "requires proof of three essential elements: (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froehlich v. Ohio Dept. of Mental Health*, 871 N.E.2d 1159, 1162 (Ohio 2007). And, the Ohio Supreme Court has clarified:

1. In an action for malicious prosecution, the want of probable cause is the gist of the action. If such be proven, the legal inference may be drawn that the proceedings were actuated by malice.

2. In determining the want of probable cause, the defendant's conduct should be weighed in view of his situation and of the facts and circumstances which he knew or was reasonably chargeable with knowing at the time he made the criminal complaint.

*Huber v. O'Neill*, 419 N.E.2d 10, 11-12 (Ohio 1981) (quoting *Melanowski v. Judy*, 131 N.E. 360, syllabus (1921)). The second provision is critical to this case.

### *A. Malice*

Viewing the evidence in the light most favorable to the Briners, we find that there is sufficient evidence in the record to support a jury finding of malice and raise a genuine issue of material fact. Among other things, Chief McClaran admitted that he was annoyed with the Briners for their criticism (and voiced a willingness to punish them for it). Det. Snavely and Officer Hill also testified that they were offended. From the evidence, a jury could also conclude that this ill-will led to the prosecution, as a jury could reasonably conclude that the intense focus on possible falsehoods by Ms. Briner instead of investigating the Briners' complaint regarding the alleged theft of their GMC truck illustrates a desire to find some way to punish her for her and her husband's complaints. A reasonable jury could also interpret the decision to reinstate the investigation of Ms. Briner shortly

after the Briners' ballot proposal succeeded in getting on the ballot as being motivated by malice.

### *B. Termination of the Prosecution in Favor of the Accused*

The city law director originally filed three misdemeanor charges against Melanie Briner: "tampering with records," "falsification," and "complicity to commit falsification." The prosecutor dismissed the first two charges prior to trial and they were never re-filed. The court dismissed the third charge at the close of the prosecution's case, a point at which jeopardy had attached.

Despite the defendants' suggestions to the contrary, it is clear that this prosecution was terminated in favor of Melanie Briner. The Briners have clearly met this element.

### *C. Probable Cause*

The Ohio Supreme Court explained that "the want of probable cause is the gist of the action," and "[i]n determining the want of probable cause, the defendant's conduct should be weighed in view of his situation and of the facts and circumstances which he knew or was reasonably chargeable with knowing at the time he made the criminal complaint." *Huber*, 419 N.E.2d at 12. That is, we must look behind a defendant's mere assertion of probable case to consider his "view of his situation" and "the facts and circumstances" which he knew *or should have known*. *Id*. It is this caveat, which the district court failed to consider, that changes the complexion of this analysis.

The district court said "there is plenty of undisputed evidence in the record to establish probable cause." Mem. Op., April 16, 2008, at 23. When the entirety of the record is considered, however, it is clear that the evidence which would support a finding of probable cause is far from undisputed. When considered in light of what these defendants (Chief McClaran, Det. Snavely, and Officer Hill) actually knew or *should have known*, given their view of the situation, a reasonable jury could find that there was no probable cause to prosecute Ms. Briner. *See Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).

33

As but one example, we note that the district court relied on the apparent contradiction between Ms. Briner's earlier assertion that no one but she had seen Larry sign the title and the subsequent statement from Ms. Hissong that she had seen precisely that. However, the full context of Ms. Briner's statement, known to Officer Hill, was that she didn't believe anyone could have seen into her office to see Larry sign the title. That Officer Hill was aware of the context of Ms. Briner's statement is clear from the fact that he repeatedly asked Ms. Briner to question her employees regarding the events of December 30, 2004, in order to determine if anyone had seen anything. Ms. Briner, therefore, could be seen as simply fulfilling Officer Hill's request in obtaining statements of those who saw Larry sign the title, in order to allow the investigation to progress.

Other facts also could support a jury finding that there was no probable cause to prosecute Ms. Briner. Ms. Briner provided two additional sworn statements from F&W employees which corroborated the statements by Ms. Briner and Ms. Hissong regarding Larry signing the title, but no one at the Department ever investigated those statements. A jury could legitimately question why Officer Hill would accept, without apparent question, the Paones' assertion that Larry had not been to F&W on December 30 when the facts appear to show that, also on December 30, he fraudulently obtained a duplicate copy of the title to the GMC truck.[25] Likewise, a reasonable jury could determine that Officer Hill and Chief McClaran, among others present when Ms. Hissong recanted her sworn statement, should have suspected that Ms. Hissong only recanted due to the extreme pressure brought to bear on her. Finally, a reasonable jury could question the motives of those at the Department in investigating Ms. Briner and Ms. Hissong after consideration of Det. Snavely's

[25]Larry repeatedly asserted that he had given the Briners the title to the GMC truck prior to December 30, 2004, and never denied that he had transferred ownership of the GMC truck to the Briners, yet he obtained a duplicate title by fraudulently asserting that the truck was his and that the title was lost or stolen, rather than having been given to the Briners.

34

possible bias against Ms. Hissong and the fact that Chief McClaran had informed the Department that it was not to pursue any investigation of the Paones for the theft of the GMC truck. This evidence, along with other evidence in the record, creates a genuine issue of material fact regarding the existence of probable cause to arrest Ms. Briner.

Because there are material facts in dispute, this question should go to a jury, and summary judgment is not appropriate. The grant of summary judgment to the City, Chief McClaran, Det. Snavely, and Officer Hill on this issue is reversed. The district court's grant of summary judgment to Mr. Strickler is affirmed, as there are no facts in the record suggesting that Strickler had anything to do with initiating charges against Ms. Briner. Because this is a jury question, the denial of the Briners' motion for summary judgment is also affirmed.

### 3. First Amendment Claim Regarding the Yard Signs

The Briners claim that they posted yard signs as a form of political speech protected by the First Amendment. They claim that the City, including certain police officers and the zoning inspector (Mr. Strickler), unlawfully threatened and harassed them in response to these yard signs. Specifically, they claim that Mr. Strickler repeatedly threatened them, by telephone, with prosecution, and sent threatening letters (until they obtained assistance from the ACLU), and that police cars routinely parked in front of their home for long periods of time in an attempt to intimidate them. Although the Briners did not surrender and take down the signs, they were subjected to efforts at intimidation by members of the Department and have alleged that they suffered some amount of anxiety, fear, and intimidation.

The district court held that "the Briners' [F]irst [A]mendment right of free speech was not actually violated; they were not prevented from speaking by way of their yard signs. In other words, they suffered no first amendment injury-in-fact." Mem. Op., April 16, 2008, at 30. This is true, so

35

far as it goes. To the extent that they are attempting to make a claim for abridgment of free speech, the Briners cannot survive summary judgment because their speech was not abridged. They said plenty.

But the district court also held that this claim was "not pled as a retaliation claim. Therefore, the Court does not construe the allegations of Claim 8 as part of the first amendment retaliation claim contained in Claim 1." *Id.* at 30 n.30. True, it might not have been pled that way, but it was (and is) certainly argued that way. This claim must be treated as a retaliation claim. As such, the Briners need not show that they were actually chilled from engaging in protected speech, but they must still satisfy traditional standing requirements. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). In *Thaddeus-X*, we held that "[a]s long as the injury is 'distinct and palpable' rather than abstract, conjectural, or hypothetical, it is sufficient to confer standing." *Id.* While the alleged injury to the Briners is not severe, the allegations of fear, intimidation, and anxiety are not so ephemeral as to be properly classified as "abstract, conjectural, or hypothetical," and the Briners have established standing.

We reverse the district court's grant of summary judgment to the City and Chief McClaran on this issue. We affirm the district court's grant of summary judgment to Det. Snavely and Officer Hill, inasmuch as there is no contention (or evidence) that they had anything to do with this. Likewise, we affirm the district court's grant of summary judgment to Mr. Strickler, as there is insufficient evidence to support the existence of a conspiracy between Mr. Strickler and Chief McClaran to punish the Briners' for their criticism of the Department and Chief McClaran. And we affirm the district court's denial of the Briners' motion for summary judgment.

### 4. First Amendment Claim Regarding the Public Meeting

The Briners assert that their right to address the City Council during the public comment

36

section of a meeting is clearly established. *See McBride v. Village of Michiana*, 100 F.3d 457, 459

(6th Cir. 1996) (unlawful to remove a reporter from a public meeting); *see also Riddle v.*

*Egensperger*, 266 F.3d 542, 550 (6th Cir. 2001) ("Freedom to criticize public officials and expose

their wrongdoing is at the core of First Amendment values[.]"); *Glasson v. City of Louisville*, 518

F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and

policies and advocate peacefully ideas for change is the central meaning of the First Amendment.").

The district court analyzed this issue as follows:

> The record reveals that there is absolutely no basis in fact for this claim. . . . Mr. Briner addressed the City Council on several occasions. In particular, Mr. Briner spoke to the City Council on February 1, 2007, but was stopped by the Council president when he began, inappropriately, to talk about the instant lawsuit; in fact, he was escorted out of the meeting when he continued to speak after the Council [P]resident told him he was out of order. There is no constitutional right to disrupt city meetings by speaking out of order.
>
> According to the undisputed facts established by Mr. Briner's own testimony, neither Mr. or Mrs. Briner was prevented from making *appropriate* public comments at City Council meetings. Therefore, summary judgment in favor of the City with respect to this claim is appropriate.

Mem. Op., April 16, 2008, at 28-29 (footnote omitted; emphasis in original). The district court did

not cite any legal precedent for its proposition that the government may limit speech to content it

deems "appropriate," nor did it identify any objective criteria for determining whether public

comments are "appropriate." The specific speech that the Council President suppressed as

"inappropriate" was Mr. Briner's questioning about the litigation — the President (and the district

court) deemed the content of the questions "inappropriate." The Council President's determination

that Mr. Briner was "out of order," and therefore engaged in "inappropriate" public comments,

appears to be based on nothing more than the content of Mr. Briner's speech.

Based on the record, the Briners appear to have been engaged in legitimate questioning and

37

criticism of public officials, conduct protected by the First Amendment. There is no evidence on the record that Mr. Briner was engaged in any threatening or harassing behavior, so Mr. Briner should have been allowed to ask the Council (his government) virtually any question on any topic he likes, though the Council would not have been required to answer. The Council would have been within its rights to set certain limits on the public comment portion of the meeting and could have refused to answer questions it does not want to answer; it cannot, however, prohibit protected political speech on the vague and broad grounds that the content of that speech is "inappropriate." The Briners raise legitimate questions of material fact for the jury, and summary judgment was inappropriate.

### 5. Equal Protection Claim

The district court held that the Briners cannot support their equal protection claim that "the yard sign enforcement by the City was 'selective.'" Mem. Op., April 16, 2008, at 30. The Briners claimed that, by disallowing their portable sign but allowing every other portable sign all over town, the City was enforcing a rule against them that it did not enforce against anyone else — and they offered pictures of a dozen portable signs that the City was then allowing. The district court explained:

> All of the photographs [that the Briners submitted as evidence of non-enforcement of the sign restriction, for purposes of showing selective prosecution] show yard signs that amounted to advertising. There were no political signs which might be used to compare content to see if the Briners' content was being challenged whereas similar content on other signs was not challenged.

*Id.* at 31. This statement by the district court indicates a misunderstanding regarding the Briners' claims. The Briners allege that the City challenged their signs because of their content and viewpoint (political, critical of the City), while it allowed other signs because of their different content

38

(advertising, viewpoint-neutral). The First Amendment does not allow for this distinction.

The Briners also argue that they are a "class of one," in the mold of *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Evidence was submitted to the district court that Mr. Strickler admitted this was the only time he had ever sought to have a political sign removed or to prosecute someone for posting such a sign. This raises a genuine issue of material fact regarding whether enforcement of the City's sign ordinances was selective; summary judgment was therefore inappropriate.

## 6. Municipal Liability Claim

"Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986)). In its original order, the district court concluded: "There is no question that a police chief is at least one of the policy-making authorities for a city police department. Therefore, if McClaran is found liable in his official capacity, municipal liability will attach to City of Ontario." Mem. Op., April 16, 2008, at 28. The district court only disallowed the municipal liability claim after it had granted summary judgment to Chief McClaran.

Because Chief McClaran is not entitled to summary judgment on the other claims (as explained herein), the municipal liability claim survives. Summary judgment was inappropriate.

## 7. Defamation Claim

The district court dismissed this claim, *sua sponte*, because it found the accusation in the complaint to be too vague. The court cited no authority to justify this dismissal. This is not a question of subject matter jurisdiction or a statutorily imposed gatekeeping function (e.g., 28 U.S.C. § 1915A or 28 U.S.C. § 2254). This was a decision based on the plaintiffs' pleading.

The Third Circuit and the Ninth Circuit (in at least one case) allow courts to dismiss claims, *sua sponte*, when it is clear from the face of the pleading that the plaintiff cannot obtain relief. *See*, *e.g.*, *Ray v. Kertes*, 285 F.3d 287, 297 (3d Cir. 2002); *Bryson v. Brand Insul., Inc.*, 621 F.2d 556, 559 (3d Cir.1980); *Bintliff-Ritchie v. Am. Re. Co.*, 285 F. App'x 940, 943 (3d Cir. 2008); *Speight v. Sims*, 283 F. App'x 880, 881 (3d Cir. 2008); *McManama v. Jones*, 258 F. App'x 941 (9th Cir. 2007). The majority of Circuits do not follow this approach. *See*, *e.g.*, *Lozano v. Ocwen Federal Bank, FSB*, 489 F.3d 636, 642 (5th Cir. 2007); *Dawson v. Newman*, 419 F.3d 656 (7th Cir. 2005); *Fredyma v. AT&T Network Sys., Inc.*, 935 F.2d 368 (1st Cir. 1991); *Thomas v. Scully*, 943 F.2d 259 (2d Cir.1991); *Smith v. Boyd*, 945 F.2d 1041 (8th Cir.1991). We have never allowed this in the Sixth Circuit. *See*, *e.g.*, *Robbins v. Cyprus Cumberland Coal Co.*, 146 F.3d 425, 429 (6th Cir. 1998); *Andreano v. City of Westlake*, 136 F. App'x 865 (6th Cir. 2005); *Flood v. Phillips*, 90 F. App'x 108, 114 (6th Cir. 2004); *Hargate v. Gaines*, 1999 WL 397956, *2 (6th Cir. 1999). At any rate, it is not clear from the pleading that the Briners would be unable to obtain relief, so even in the Third Circuit and Ninth Circuit dismissal of the Briners' defamation claim would have been inappropriate. This claim must be reinstated.

### 8. Civil Conspiracy Claim

The district court granted summary judgment on this claim based on its conclusion that only Chief McClaran was even possibly liable and the proposition that "[a] person cannot conspire with himself." Mem. Op., April 16, 2008, at 27. After having concluded that the only constitutional right that might have been violated was the Briners' First Amendment right of free speech when Chief McClaran removed F&W from the tow-list, the district court determined that no one but Chief McClaran was involved, so there could be no conspiracy.

As described herein, we believe that district court misunderstood the Briners' complaint and

40

the requirements of the summary judgment standard. We have reversed the grant of summary judgment on four of the Briners retaliation claims, requiring the reinstatement of claims against other defendants. The district court's justification for granting summary judgment on the Briners' civil conspiracy claim, therefore, is no longer valid. The evidence in the record also indicates the existence of genuine issues of material fact regarding the existence of a conspiracy. Sufficient evidence exists to support a jury finding that Chief McClaran, Det. Snavely, and Officer Hill — and possibly others — worked in concert over a 14-month period to further the malicious prosecution of Ms. Briner. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-52 (1970).

We reverse the grant of summary judgment on this claim. We leave for the district court, upon remand, to determine whether the intra-corporate conspiracy doctrine, first raised by defendants on appeal, may be invoked as a defense, *Hull v. Cuyahoga Valley Joint Voc. Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991) ("Since all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy."), or whether, as the Briners claim, the doctrine is inapplicable to § 1983 actions, *Kinkus v. Village of Yorkville*, 476 F.Supp.2d 829, 838-41 (S.D. Ohio 2007), *reversed on other grounds*, 289 F. App'x 86, 90 n.4 (6th Cir. 2008).

### 9. State Law Claims

The district court declined jurisdiction over the state law claims, citing 28 U.S.C. § 1367(c)(3), which says: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if. . . the district court has dismissed *all* claims over which it has original jurisdiction" (emphasis added). Based on the foregoing, in which we reinstated almost all of the federal claims, we must reinstate the state law claims as well.

### CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's grant of summary judgment on the

fifth retaliation claim, on the malicious prosecution claim as to Mr. Strickler only, and on the First Amendment claim as to Det. Snavely and Officer Hill only. We also **AFFIRM** the district court's denial of summary judgment to the Briners. We **REVERSE** the district court's grant of summary judgment on all remaining claims and as to all remaining parties, and **REMAND** this case to the district court for further proceedings consistent with this opinion.[26]

---

[26]In their brief on appeal, the City defendants raise a qualified immunity claim. As they did not present this to the district court, we will not consider it here. They may raise it on remand if they so choose.